1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                          EASTERN DISTRICT OF CALIFORNIA

8

9    SOPHIA QUINTANAR on behalf of J.Q.,        No. 1:18-cv-01099-GSA

10                        Plaintiff,

11        v.                                      **ORDER REVERSING DENIAL OF**
                                                  **SUPPLEMENTAL SECURITY INCOME**
12   ANDREW SAUL, Commissioner of Social         **AND REMANDING CASE FOR**
     Security,                                    **FURTHER PROCEEDINGS**
13

14                        Defendant.

15

16       **I.       Introduction**

17       Plaintiff Sophia Quintanar ("Plaintiff") on behalf of her minor child, J.Q. ("Claimant"),

18   seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner"

19   or "Defendant") denying J.Q.'s application for supplemental security income pursuant to Title

20   XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs

21   which were submitted without oral argument to the Honorable Gary S. Austin, United States

22   Magistrate Judge.[1]  *See* Docs. 14, 21 and 22. Having reviewed the record as a whole the Court

23   finds that the hearing decision failed to analyze fully the extensive evidence concerning the

24   impact of Claimant's impairments on his functioning in the six domains relevant to childhood

25   disability, and to evaluate the evidence in conformity with applicable law. Accordingly, the

26   Court remands the case for further proceedings in accordance with this decision.

27   _____

28   [1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 6 and 7.

## II.    Procedural Background

On January 30, 2009, Plaintiff filed an application on behalf of Claimant for supplemental security income alleging disability beginning October 24, 2002.  AR 132.  The Commissioner denied the application initially and following reconsideration.  AR 132.  Administrative Law Judge John Cusker presided over an administrative hearing on May 21, 2011.  AR 68-98. Plaintiff and Claimant appeared and were represented by an attorney.  AR 68.  On September 23, 2011, the ALJ denied Plaintiff's application.  AR 132-44.  Plaintiff did not appeal the Commissioner's decision.

On October 17, 2014, Plaintiff again filed an application on behalf of Claimant for supplemental security income alleging disability beginning October 24, 2002.  AR 16.  The Commissioner denied the application initially on January 15, 2015, and following reconsideration on April 1, 2015.  AR 16.

On April 15, 2015, Plaintiff filed a request for a hearing.  AR 16.  Administrative Law Judge Sharon Madsen presided over an administrative hearing on February 7, 2017.  AR 99-128. Plaintiff and Claimant appeared and were represented by an attorney.  AR 99.  On March 1, 2017, the ALJ denied Plaintiff's application.  AR 16-35.

The Appeals Council denied review on July 5, 2018.  AR 1-6.  On August 15, 2018, Plaintiff filed a complaint in this Court.  Doc. 1.

## III.    Factual Background[2]

Claimant was exposed to drugs and alcohol in the womb before being born prematurely (at 26 weeks gestation) in October 2002.  AR 569.  His birth rate was very low, perhaps less than one pound, and he initially was cared for in a newborn intensive care unit (NICU).  AR 569. Multiple foster families cared for Claimant before Plaintiff, his great-aunt, assumed care of Claimant when he was three.  AR 551, 569.  In April 2008, Plaintiff finalized her adoption of Claimant.  AR 518.

///

---

[2] This section provides a brief summary of Claimant's social and academic difficulties prior to September 24, 2011, the first date on which Claimant was eligible to receive benefits in this action.

Claimant's early developmental milestones were delayed.  AR 378.  Claimant did not walk until he was two years old and did not speak in sentences until he was four.  AR 570.  Although Claimant began kindergarten just prior to his fifth birthday (2007), Plaintiff withdrew Claimant from kindergarten in September because of his teacher's concerns about Claimant's social and emotional behavior.  AR 494.

Claimant returned to kindergarten the following year (2008-09).  Throughout his time in the primary grades, teachers and school professionals noted multiple academic and behavioral concerns.  AR 492.  Early school records note a history of chronic lung disease (asthma), lazy eye,[3] and symptoms of attention deficit/hyperactivity disorder (ADHD).  AR 492.  Despite special education assistance, Claimant had difficulty reading, demonstrated below average academic skills, was easily frustrated and behaved poorly in the classroom.  AR 492.

Beginning in third grade (2011-12), Plaintiff and Claimant received family counseling and Claimant received psychiatric services through a mental health program between the local school district and the Fresno County Department of Behavioral Health.[4]  AR 544-58.  Claimant's initial diagnosis was adjustment disorder with mixed disturbances.  AR 544.

### IV.    Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation

---

[3] Amblyopia (lazy eye) develops when a patient has one eye with poor vision.  Communication between the brain and the eyes deteriorates and the brain relies only on the eye with stronger vision.  Over time, the vision in the weak eye worsens.  www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/amblyopia-lazy-eye (accessed January 14, 2020).

[4] Plaintiff had secured psychological treatment for Claimant sometime before October 2009, but discontinued care when she learned that her insurance would not cover the expense.  AR 492.

3

omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

### V.    The Hearing Decision

The ALJ found that Claimant was an adolescent on the date of application and on the date of the decision.  AR 19.  Claimant had not engaged in substantial gainful employment at any time relevant to the proceedings.  AR 19.  His severe impairments were attention deficit/hyperactivity disorder (ADHD), bipolar disorder and oppositional defiant disorder.  AR 19.  None of Claimant's impairments or combination of impairments met or medically equaled the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 19.

The ALJ concluded that Claimant did not have an impairment or combination of impairments that functionally equaled the severity of the listings.  AR 20.  In reaching her determination, the ALJ reviewed testimony provided by Plaintiff and Claimant, school records, medical evidence of record, and the medical opinions of Claimant's treating physician (Dr. Domanska) and the state agency medical consultants.  AR 27.  The ALJ concluded that Claimant had no limitation in moving about and manipulating objects.  AR 32-33.   He had less than marked limitation in acquiring and using information, attending and completing tasks, health and physical well-being, ability to care for himself, and health and physical well-being.  AR 28-31, 33-35.  Claimant had marked limitation in interacting and relating with others.  AR 31-32.  Accordingly, the ALJ concluded that Claimant was not disabled.

///

4

## VI. Credibility of Plaintiff and Claimant

Neither party challenges the ALJ's assessment of Plaintiff's or Claimant's credibility. Courts generally do not address issues not raised by the parties on appeal. F.R.App.P. 28(a); *Crawford v. Gould*, 56 F.3d 1162, 1169 (9th Cir. 1995). Nonetheless, in the interest of complete examination of the ALJ's whole child analysis the Court includes the following brief discussion of Plaintiff's and Claimant's testimony and the ALJ's assessment of that testimony.

### A. Testimony of Plaintiff and Claimant

#### 1. Claimant's Testimony

At the February 7, 2017 hearing, the fourteen-year-old Claimant did not know his height or weight. AR 102-03. He lived in a house with his mother and brother.[5] AR 103. Claimant was able to perform household chores "like sweep and stuff" and could cook a cup of noodles. AR 103. He liked music, drawing and football but did not follow professional sports or play on a school team.[6] AR 104. He did not use a computer or play video games.[7] AR 112. Claimant had friends but did not belong to any groups. AR 104.

Claimant attended school where he was in the eighth grade. AR 105. Claimant thought he had difficulty both in understanding instructions and in paying attention. AR 112. He liked history but not math. AR 105. He did not read very well, describing it as "hard work." AR 105. He denied suspensions or expulsions in middle school (AR 106), but later conceded that he had been sent to detention for behavioral problems including outbursts of anger and fighting. AR 111.

Claimant acknowledged a recent stint in juvenile detention but initially denied knowing why he had been detained. AR 106. Ultimately, he stated that he had cut off his ankle monitor. AR 107. He did poorly in school at juvenile detention because the curriculum was more difficult

///

---

[5] Claimant's family consisted of Plaintiff, Claimant, a younger brother and several foster children. This opinion collectively refers to all children living in Plaintiff's home as "siblings."

[6] Evidence elsewhere in the record indicated that Plaintiff was not eligible to participate in school sports because of his low grades.

[7] In the earlier proceeding, Plaintiff testified that she had removed video games from her home because the children fought excessively over the games.

than his neighborhood middle school.  AR 107.  Claimant had difficulties with other students at juvenile detention.  AR 110.  He had been pepper sprayed by a guard for misbehavior.  AR 110.

Claimant was currently taking medication for attention deficit disorder which helped him focus.  AR 107.  He needed his mother to remind him to take his medication. AR 108. Counseling had not helped him.  AR 107-08

## 2. **Plaintiff's Testimony**

Testifying after Claimant had left the hearing room, Plaintiff stated that she tried to be very careful about what she said to Claimant at home since he was defiant and would run away from home if he did not like what Plaintiff was saying.  AR 114.  Typically, Claimant would only disappear for a few hours to hang out with friends at the mall, but he had also left home for days at a time.  AR 115. Plaintiff had hidden Claimant's shoes and installed locks on the doors and windows to keep Claimant at home, but Claimant would still leave the house as soon as Plaintiff and his siblings were asleep.  AR 116, 122.

Claimant had been returned to juvenile detention the month before the hearing for violating his probation by cutting off his electronic bracelet and running away from home.  AR 119.  When Plaintiff ran away he lived on the streets and abused alcohol and marijuana.  AR 122.  During periods when Claimant had run away, he missed his regular medication, doctors' appointments and counseling.  AR 123, 126.

Claimant experienced anger outbursts when he did not get his way, woke up in a bad mood or did not feel like talking.  AR 123.  At those times he appeared to become a different person, punching in walls or refusing to take his medication.  AR 123.  Plaintiff and Claimant's siblings were afraid of him when he was angry and would leave Claimant alone until he left the house.  AR 123.

Claimant was disrespectful to his teachers and was frequently assigned to detention for disrupting or distracting the class.  AR 115.  He fought at school and at juvenile hall.  AR 124.  Classified as a student with "other health impairments," Claimant had an IEP that provided for mainstreaming with special accommodations and resource room placement.  AR 117.

///

6

## B.  The ALJ's Use and Assessment of Testimony

The hearing decision summarized Plaintiff's and Claimant's testimony.  AR 20-21.  The ALJ minimized the testimony, writing:

> After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

AR 21.

Because the hearing decision sets forth only this standard statement, which appears as standard language in all Social Security hearing decisions, the Court is unable to assess what portions of the testimony the ALJ found reliable and what portions she found inconsistent with other documentary and opinion evidence.  Despite the potential use of the agency hearing to resolve ambiguities or incomplete information in the written agency record, neither the ALJ nor Plaintiff's attorney used focused questions to secure detailed information about Claimant's strengths and limitations that would be helpful in the ALJ's performance of the whole child analysis.  Ultimately, the testimony received minimal consideration in the hearing decision.

## VII.  ALJ's Analysis of Medical Opinions

Plaintiff contends that the ALJ erred by rejecting the opinion of Claimant's treating psychiatrist, Maria Szpyt-Domanska, M.D. ("Dr. Domanska"), in favor of the opinions of the agency psychologists Alan Goldberg, Psy.D., and Thomas L. Clark, Ph.D, and agency surgeon R. Fast, M.D.  The Commissioner does not directly address the issue of whether the ALJ improperly favored the opinions of the agency psychologists and surgeon, instead contrasting educational records and the opinions of school personnel with the opinions of Dr. Domanska, concluding that substantial evidence supported the ALJ's determination.  After evaluating the record as a whole in light of applicable law, the Court concludes that the ALJ's analysis of medical opinion included multiple errors, requiring remand.

///

///

### A. Medical Records and Opinions

#### 1. Agency Psychologists and Surgeon

The initial (January 2015) analysis of Claimant's application found that Claimant's impairments were ADHD, affective disorders and asthma. AR 154. The evaluation included medical and educational records received through October 2014 (sixth grade). Psychologist Alan Goldberg, Psy.D., and surgeon R. Fast, M.D., opined that Claimant had less than marked impairment in the domains of acquiring and using information; attending and completing tasks; interacting and relating with others; and, caring for self. AR 155-56. Claimant had no limitation in moving about and manipulation of objects, or health and physical well-being. AR 155-56. Drs. Goldberg and Fast opined that Plaintiff's allegations and Dr. Domanska's opinion were less than fully credible since neither was supported by overall objective findings. AR 157. The opinions were supported by brief notations which lack specific citations to the record. AR 155-56.

The record on reconsideration also included materials received from Fresno County Behavioral Health in March 2015 and the hearing decision that completed Claimant's prior application for supplemental security income. AR 163-64. In March 2015, agency psychologist Thomas L. Clark, Ph.D., agreed with the initial assessment AR 167-68.

#### 2. Dr. Domanska

The record includes Dr. Domanska's medication progress notes from December 2013 through July 2016. AR 678-93, 734-57. In June 2012 (end of 3rd grade), Dr. Domanska conducted a psychiatric assessment of Claimant. AR 792-94. Claimant had been referred for evaluation because of apparent auditory hallucinations. AR 792. He received special education for behavioral reasons. AR 793. Earlier, a brief trial of Ritalin had been discontinued after Claimant became psychotic. AR 792. The doctor diagnosed bipolar I disorder, severe with psychotic features; attention deficit hyperactivity disorder (combined); and, oppositional defiant disorder. AR 794.

///

///

As treatment progressed, Dr. Domanska secured partial Conners scale ratings[8] from Claimant's fifth grade teachers.  AR 444-45, 447, 450.  The teachers' responses were not identical but revealed certain areas of agreement.  All three fifth-grade teachers stated that Claimant displayed the following behaviors that were "very much" a problem: (7) distractibility or attention span a problem and (15) excitable, impulsive.  AR 444, 445, 447.  Two teachers indicated that the following behaviors were "very much" a problem and one indicated that the same behaviors were "pretty much" a problem: (1) restless in the "squirmy" sense; (2) makes inappropriate noises when he shouldn't; (8) disturbs other children; (14) restless, always "up and on the go"; (16) excessive demands for teacher's attention; and, (22) childish and immature.  AR 444, 445, 447.  The three teachers agreed that the behavior, "demands must be met immediately," was "pretty much" a problem.  AR 444, 445, 447.

In October 2014 (6th grade), Dr. Domanska prepared a medical source statement for Claimant.  AR 643-46.  Diagnoses included ADHD, bipolar disorder and oppositional defiant disorder.  AR 643.  Symptoms included mood instability, anger, aggression, problems with paying attention, focusing, opposition and attitude.  AR 644.  In Dr. Domanska's opinion, Claimant had marked impairment in acquiring and using information, attending and completing tasks, and interacting and relating with others.  AR 644.  He had moderate impairment in his ability to care for himself.  AR 645.  Claimant had no impairment in moving about and manipulating objects, or in health and physical well-being.  AR 644-45.  Claimant took Abilify, a mood stabilizer, and denied experiencing side effects.  AR 645.  Dr. Domanska did not address Claimant's compliance with medication and treatment.

In March 2015, Dr. Domanska prescribed Concerta to address Claimant's inattention.  AR 754.  In August 2015, Claimant was generally stable with occasional anger and irritability mostly attributable to his family situation.[9]  AR 750.  He denied any psychotic symptoms or aggressive

---

[8] The Conners rating scale is an assessment tool designed to assess ADHD and its most common co-morbid problems in children and adolescents by obtaining parents' and teachers' observations concerning the child's behavior. www.pearsonclinical.com.au (accessed February 4, 2020).

[9] Although evidence concerning other portions of the time period at issue here reveal that Claimant's immediate and extended family experienced chronic financial limitations and a variety of stressful events, the record includes no information concerning the family's particular situation in summer 2015.

behavior.  AR 750.  Inattention problems continued but Plaintiff had not filled the prescription for Concerta.  AR 750.

In November 2015 (seventh grade), Plaintiff told Dr. Domanska that using Concerta since Claimant's last visit had "helped a bit," but Claimant still experienced symptoms of inattention, mood instability and angry outbursts.  AR 746.  Dr. Domanska changed the medication dosage "hopefully" to stabilize Claimant's symptoms.  AR 746.

In treatment notes from January 2016 (seventh grade), Dr. Domanska noted that Claimant continued to have "problems with focusing, paying attention and inappropriate behavior."  AR 742.  Without consulting the doctor, Plaintiff had increased Claimant's dosage of Abilify about two weeks prior without seeing much improvement.  AR 742.  Claimant continued to experience auditory hallucinations.  AR 742.  Dr. Domanska kept the original dose of Abilify but increased the dosage of Concerta "to better address his function."  AR 742.

In treatment notes prepared in April 2016 (seventh grade), Dr. Domanska noted Plaintiff's continued reports that the prescription medications were not working for Claimant.  AR 738.  Plaintiff was experiencing "[a] lot of behavioral issues, anger, oppositional attitude, blaming everything on others," and had poor grades and continued difficulty focusing.  AR 738.  Dr. Domanska and Plaintiff discussed "adding clonidine pm, agitation, working on behavioral issues and keeping current use of medication."  AR 738.

On January 30, 2017 (8th grade), Dr. Domanska provided a medical source statement.  AR 896-99.  Dr. Domanska opined that Claimant had marked impairment in the domains of acquiring and using information, and attending and completing tasks.  AR 897.  He had moderate impairment in the domains of interacting and relating with others and caring for himself.  AR 897-898.  He had no impairment in moving about and manipulating objects or health and physical well-being.  AR 898. In support of her opinions, Dr. Domanska noted that Claimant was impulsive, forgetful, and easily distracted, and had poor insight and judgment and a poor attention span.  AR 897.  His mood instability affected his social interaction.  AR 897.  He needed reminders to take his medication.  AR 897.  Diagnoses were Bipolar Disorder with Psychotic Features and ADHD.  AR 896.  Prescription medications were Abilify and Concerta.  AR 898.

## B. The Hearing Decision

After summarizing some of the medical evidence in the administrative record, the ALJ considered Dr. Domanska's 2014 and 2017 medical source statements and the opinions of the agency medical consultants. AR 26-27. Favoring the opinions of the agency consultants over those of Dr. Domanska, the ALJ wrote:

> I give significant weight to the findings of the state agency medical consultants as they are generally consistent with the school records and medical evidence as a whole. The evidence shows that while the claimant has academic and behavioral problems, his symptoms admittedly improved when he is compliant with his psychotropic medications. There is rampant evidence of noncompliance with medications and mental health treatment, as indicated above. Mental status examinations show the claimant was restless and had poor judgment, but were essentially normal otherwise and the claimant consistently had moderate GAF scores, as noted above. The claimant's poor academic performance appears to be more the result of the claimant not applying himself and not doing his homework. Despite low average intelligence scores, the records suggest the client can do much better academically if he applied himself. In addition, the claimant has not been held back in any grades, and his attendance rate has been 92%. The recent IEP's in 2016 show the claimant is doing better in middle school, above.
>
> I give little weight to the opinions of Dr. Domanska, above. I disagree that the claimant has marked limitations in acquiring and using information and attending and completing tasks as the medical evidence of record shows the claimant's symptoms are improved when he is compliant with his medication. Dr. Domanska even reported in 2014 that the claimant was compliant with his medication and his symptoms were under control at that time, above, which indicates the claimant's symptoms can be controlled with medications. In addition, marked limitations in social interaction are apparent based on claimant's history of behavioral problems and placement in juvenile hall.

AR 27.

## C. Weighing Medical Opinion

The medical opinions of treating professionals are given special weight because a treating physician is "employed to cure and has a greater opportunity to know and observe the patient as an individual." *Augustine ex rel. Ramirez v. Astrue*, 536 F.Supp.2d 1147, 1152 ( C.D.Cal. 2008) (quoting *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *Sprague v. Bowen*, 812 F.3d 1226, 1230 (9th Cir. 1987)). However, the opinions of a treating or examining

11

physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan*, 169 F.3d at 600 (9th Cir.). Nonetheless, "the ALJ must provide clear and convincing reasons for rejecting the uncontroverted opinion of a treating physician." *Augustine*, 536 F.Supp.2d at 1152 (citations omitted). "Even if [a] treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Augustine*, 536 F.Supp.2d at 1152 (quoting *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). He properly determines the weight to be given each medical opinion by considering the evidence in the record as the ALJ did here. 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). The record must include objective evidence to support the medical opinion of the claimant's residual functional capacity. *Meanel v. Apfel*, 172 F.3d 1111, 1113-14 (9th Cir. 1999). Inconsistencies with the overall record or with a physician's own notes are a valid basis to reject a medical opinion. *Molina v. Astrue*, 674 F.3d 1104, 1111-1112 (9th Cir. 2012) (recognizing that a conflict with treatment notes is a germane reason to reject a treating physician's assistant's opinion); *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (rejecting physician's opinion when treatment notes provide no basis for the opined functional restrictions); *Tommasetti*, 533 F.3d at 1041 (incongruity between questionnaire responses and the Plaintiff's medical records is a specific and legitimate reason for rejecting an opinion); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692-693 (9th Cir. 2009) (holding that a conflict with treatment notes is a specific and legitimate reason to reject a treating physician's opinion).

///

D. **The Analysis of Dr. Domanska's Opinion Did Not Reflect the Record as a Whole and Did Not Rely on Appropriate Legal Authority**

As quoted in full above, the ALJ gave little weight to Dr. Domanska's opinions, particularly the doctor's 2014 and 2017 opinions that Claimant had marked limitations in acquiring and using information, and in attending and completing tasks. AR 27. Noting that in 2014, Dr. Domanska reported that Claimant's symptoms were under control, the ALJ reasoned that the evidence as a whole showed the claimant's symptoms were improved when he was compliant with his medication.[10] AR 27.

An impairment that can be mitigated by medication or other treatment is not severe. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983). Substantial evidence supported the ALJ's findings that Claimant was not always compliant in taking his prescribed medications and missed many appointments with Dr. Domanska and with the social workers (Mr. Terronez and Mr. Phipps) who provided counseling at Fresno County Behavioral Health. But the ALJ's conclusion that the psychotropic medications prescribed by Dr. Domanska alleviated the effects of Claimant's impairments when taken as prescribed is not supported by the evidence.

To set aside the opinion of a treating physician in favor of the opinion of a non-examining medical advisor, as the ALJ did in this case, an ALJ must set forth specific, *legitimate* reasons that are supported by substantial evidence in the record. *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) (emphasis original). An ALJ is not permitted to "cherry-pick" from mixed results to establish a conclusion based only on the evidence that supports a denial of benefits. *Garrison v. Colvin*, 759 F.3d 995, 1017 n. 23 (9th Cir. 2014). An ALJ's focusing only on those aspects of the physician's opinion that tend to support a finding of non-disability does not satisfy the requirement of *legitimate* reasons. *Edlund v. Massanari*, 253 F.3d 1152, 1159 (9th Cir. 2001).

In this case, the ALJ relied on evidence largely drawn from early treatment records that appeared to support her conclusions while minimizing evidence that Claimant continued to

---

[10] The hearing decision does not provide a citation to the record concerning the 2014 report that medication improved Claimant's symptoms. The Court was not able to identify the ALJ's reference.

experience functional impairments even when he was taking his medications as prescribed. In fact, Dr. Domanska noted on multiple occasions in 2016 that the prescription medications were not working for Claimant. AR 738. When the record is considered as a whole, significant evidence indicates that even when Claimant complied with his prescription medication regimen, he continued to experience significant symptoms. The ALJ erred in concluding otherwise.

The medical opinion of a claimant's treating physician is entitled to controlling weight as long as it is "well-supported by acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927 (c)(2). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must determine the weight to be accorded to the treating physician's opinion based on consideration all of the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency with the record as a whole; (5) the physician's specialization; and, (6) any other factors. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ need not explicitly proceed through the list of factors but must indicate that he has considered each in his analysis. *Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017). In this case, the ALJ did not indicate that she had considered the first two factors or any specialization of Dr. Domanska beside her basic qualifications as a psychiatrist, such as pediatric psychiatry or special training or experience in treating ADHD, bipolar disorder or oppositional defiant disorder. "This failure alone constitutes reversible error." *Trevizo*, 871 F.3d at 676; *Guzman v. Berryhill*, 356 F.Supp.3d 1025, 1034 (S.D. Cal. 2018).

When evaluating a claimant with multiple serious mental health impairments, an ALJ must consider a treating physician's opinions in the context of the overall diagnostic picture that the physician draws. *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001). "Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017. A treatment notation that the claimant has made some improvement does not

mean that the claimant's impairments do not seriously affect the claimant's ability to function. *Holohan*, 246 F.3d at 1205. *See also Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194 (9th Cir. 2008). "'The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated.'" *Garrison,* 759 F.3d at 1017 n. 23 (quoting *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011)).

Here, the ALJ's conclusion that medication alleviated Claimant's symptoms also lacks support because Dr. Domanska never opined that Claimant would be functional if he took his medication as prescribed. "If a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may us such failure as a basis for finding the complaint unjustified or exaggerated. In the case of a complaint of pain, such failure may be probative of credibility, because a person's normal reaction is to seek relief from pain, and because modern medicine is often successful in providing some relief. But in the case of impairments where the stimulus to seek relief is less pronounced, and where medical treatment is very unlikely to be successful, the approach to credibility makes little sense." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).

Claimant's impairments consisted of multiple mental health conditions. The *Warre* case did not involve allegations of mental impairments. Inability to maintain a medication and treatment regimen is frequently a symptom of underlying mental illness. "[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgments in seeking rehabilitation. *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting *Blankenship v. Bowen,* 874 F.2d 1116, 1124 (6th Cir. 1989)). "[W]e do not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions." *Garrison*, 759 F.3d at 1018 n. 24. In cases involving mental illness, the ALJ must go further, examining the record to determine whether the claimant's noncompliance resulted, at least in part, from the claimant's underlying mental illness and other psychiatric issues. *Id.* The ALJ did not do so in this case.

Cases in which the claimant is a minor, as in this case, present additional questions of responsibility and accountability that are not present when the claimant is an adult with clear responsibility for his own care. Depending on the facts, an adolescent's inability to adhere to his medication and treatment regimen may more appropriately be considered a limitation in the domains of self-care, health and safety or both. *See* the discussion of the whole child analysis below.

Even if the ALJ correctly concluded that Claimant failed to comply fully with prescribed medication and treatment, failure of compliance is generally considered a matter of the claimant's credibility, not that of the physician who offered an opinion. *See, e.g.*, *Garrison*, 759 F.3d at 1016-17. A claimant's failure to pursue treatment is not a valid reason to reject the treating physician's opinion. *Regennitter v. Comm'r Soc. Sec. Admin*, 166 F.3d 1294, 1299 (9th Cir. 1999). "[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan*, 528 F.3d at 1199-1200.

For example, in *Augustine*, the minor claimant's treating physician Dr. Valdes diagnosed ADHD, depressive disorder, borderline intellectual functioning and a learning disability. *Augustine*, 536 F.Supp.2d at 1152-53. Dr. Valdes noted that the 10-year-old claimant could not get along with others, could not pay attention, could not remember things from one assignment to another and spoke of hurting herself. *Id.* The doctor also observed that the claimant could not "process authority," was "hyper" all day and ran into traffic. *Id.* Although claimant's condition improved with prescription medication, she continued to experience emotional difficulties. *Id.* The District Court found the ALJ's failure to properly assess and provide reasons for rejecting Dr. Valdes' opinion, other than the plaintiff's testimony and school records, was "clear legal error." *See also Smith ex rel. Enge v. Massanari*, 139 F.Supp.2d 1128, 1133 (S.D. Cal. 2001) (Commissioner erred in finding the claimant's asthma non-severe without setting forth specific and legitimate reasons for rejecting the opinion of claimant's treating physician that claimant had

///

chronic severe bronchial asthma). The ALJ's rejection of Dr. Domanska's opinions based on Claimant's lack of compliance with medication and treatment constituted similar legal error.

Finally, the ALJ also discounted Dr. Domanska's opinions based on several educational opinions that Claimant would do better in school if he paid attention and finished his homework. The teachers' statements to that effect (*see* discussion of educational evidence below) are ambiguous. The record does not establish that Claimant, diagnosed with ADHD, bipolar disorder and oppositional defiant disorder, actually had the ability to pay attention and finish his homework. The educational opinions may have been intended to convey that Claimant had the intellectual ability to do better in school but for his attentional and mental health impairments. The record does not include sufficient evidence to resolve the ambiguity. In any event, the ALJ's unsupported assumption that the medical opinions of Claimant's teachers should be given more weight than those of his treating psychiatrist again lacks legal support.

### E. The Agency Physicians' Opinions Were Not Based on the Record as a Whole

The ALJ gave significant weight to the state agency medical consultants' findings stating that they were "generally consistent with school records and medical evidence as a whole." AR 27. Prepared more than two years before the agency hearing, however, the agency physician and psychologists did not have the opportunity to evaluate developments in Claimant's symptoms and behavior thereafter. This means that the agency physicians did not consider the continued deterioration of Claimant's behavior and academic performance, including the criminal behavior that led to Claimant's involvement in the juvenile justice system.

"Absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own judgment for medical opinion." *Alcantara v. Astrue*, 257 Fed.Appx. 333, 334 (1st Cir. 2007). The First Circuit held that an ALJ could not give significant weight to the opinion of a non-examining consultant that was based on a significantly incomplete record. *Id.* Similarly, the ALJ in this case substituted her own conclusions about Claimant's

condition after 2015 for expert opinion. "[A]n ALJ may not act as his own medical expert as he is simply not qualified to interpret raw medical data in functional terms." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999). In this case, the ALJ erred in rejecting the opinions of Dr. Domanska in favor of opinions of non-examining physicians rendered on a partial record and her personal opinions concerning Claimant's impairments.

### F. **Failure to Consider Counselling Records**

The ALJ's review of the administrative record also failed to consider the records of Claimant's counseling sessions with social workers Mr. Terronez and Mr. Phipps. These records and opinions were entitled to consideration as other medical evidence in the record. *See Augustine*, 536 F.Supp.2d at 1152 n. 3 (citing 20 C.F.R. § 416.913(d)); *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006). In evaluating medical evidence concerning the impairments of a claimant receiving both psychiatric medication supervision and psychotherapy from social workers, an ALJ errs in failing to address the counseling records. *Augustine*, 536 F.Supp.2d 1147, 1152 n. 3 (citing *Perillo v. Astrue*, 516 F.Supp.2d 206, 208-09 (D.Conn. 2007).

### G. **Summary**

The ALJ's analysis of medical expert opinion includes multiple errors requiring remand.

### VIII. **ALJ's Analysis of Educational Opinions and Records**

Plaintiff also contends that the ALJ inappropriately rejected the opinions of Claimant's teachers that identified marked limitations in multiple domains other than interacting and relating to others. Defendant again counters that the ALJ's opinion was supported by substantial evidence.

The agency record includes lengthy and detailed records concerning Claimant's educational experience. The contents of the records are summarized below. In its comparison of the records as a whole to the ALJ's findings, the Court finds that, as with the medical opinions

addressed above, the ALJ selectively considered educational records to support her determination that Claimant had marked limitations only in interacting and relating to others. In addition, the analysis failed to delve deeply into the content of the evidence and to draw conclusions from the documents as a whole. As a result, the Court concludes that the analysis of Claimant's educational records failed to consider the evidence as a whole.

## A. Educational Opinions and Evidence[11]

### 1. 2013 Triennial Assessment

In Spring 2013 (fourth grade), the school district performed Claimant's triennial assessment. AR 615-37. Claimant's health problems included ADHD and asthma. AR 616. He displayed significant levels of problem behaviors. AR 381. Claimant himself reported significant difficulty with restlessness and impulsivity. AR 381. School psychologist Russell Koop identified a severe discrepancy between intellectual ability and achievement in mathematics calculation. AR 633.

Testing indicated low average intellectual ability, below average academic skills and below average processing skills. AR 381. Plaintiff's memory scores on the Wide Range Assessment of Memory and Learning 2 were in the low range, but may have underestimated Claimant's memory skills because of his behavior and lack of interest during portions of the test. AR 621-23. Other testing indicated numerous strengths and limitations in both intellectual abilities and educational achievement.

Mr. Koop administered the Conners Rating Scales to Claimant's teacher and Plaintiff, revealing very elevated scores on the ADHD index, restless-impulsive index, emotional lability and global index of problematic behavior. AR 624. Mr. Koop also administered the Behavior Assessment System for Children, Second Edition, to Claimant, Plaintiff and Claimant's teacher. AR 627-33. Mr. Koop summarized:

---

[11] Plaintiff's prior application on behalf of Claimant was denied September 23, 2011. Accordingly, other than background information necessary to provide context and clarity, this application concerns only evidence beginning September 24, 2011.

> [Claimant] has a history of making slow, steady academic progress, which appears to be affected by his behavior. He has consistently received N's and U's for efforts and work habits. His performance this year has decreased as the school year has progressed. It would seem that [Claimant] can display positive behavior, given this examiner's observations and as reflected by his teacher's responses on the BASC 2. However, much of the time he engages in negative, maladaptive behavior which results in lowered academic progress. [Claimant] acknowledged that he often feels that no matter what he does, he is going to fail, and this may result in the lack of effort and consequently poor grades. Current test results show that [Claimant's] intellectual ability is classified in the low average range.

AR 633.

### 2. Promotion to Fifth Grade

In June 2013, Claimant was identified for retention in the fourth grade. AR 499. Claimant's teacher successfully advocated promotion, writing "[Claimant] is currently receiving RSP services, is [a] designated English learner and I do not believe retention would be beneficial for this student if he were eligible." AR 499.

### 3. Fifth Grade Teacher Evaluations

When Plaintiff was in fifth grade (2013-14), Dr. Domanska asked Claimant's teachers to evaluate a list of classroom behaviors. AR 344-45. A summary of the teachers' ratings was set forth above in the summary of Dr. Domanska's medical opinions.

### 4. Fifth Grade IEP Review

The April 2014 IEP review indicated that Claimant took the California statewide assessment tests (referred to by the prior name, STAR tests) in modified form with testing accommodations. AR 591. Claimant was still classified as an English learner. AR 592. In Spring 2014, Claimant scored at the advanced level for science on the California Assessment of Student Performance and Progress (CAASPP). AR 509.

### 5. Sixth Grade (2014-15)

By sixth grade, Claimant's diagnoses included ADHD, Bipolar Disorder and Oppositional Defiant Disorder. AR 643. Symptoms included mood instability, anger, aggression and problems with paying attention, focusing, opposition and attitude. AR 644.

///

At the beginning of sixth grade in August 2014, special education teacher Melanie Briscoe and Plaintiff completed a child function report.[12]  AR 323-32.  Claimant, who was nearly twelve years old, had limited ability to progress in learning.  AR 327.  He was able to read upper and lower case letters, simple words and sentences, but was not able to read and understand stories in books and magazines or write a simple story with six or seven sentences.  AR 327.  Claimant could print his name and some letters but could not write in longhand (script).  AR 327.  He could add and subtract numbers over ten, but could not understand money, make correct change or tell time.  AR 327.

Claimant's impairments affected his behavior with other people.  AR 329.  Although Claimant had friends his own age, could make new friends and could play team sports, he generally did not get along with adults, including his mother, school teachers and other adults.  AR 329.

Claimant did not obey safety rules such as looking both ways before crossing the street.  AR 330.  He did not accept correction or criticism.  AR 330.  In Ms. Briscoe's opinion, Claimant was able to help himself and care for his personal needs but "cho[se]" not to do so.  AR 330.

Claimant could not pay attention or complete a task.  AR 331.  Again, Ms. Briscoe opined that Claimant had the ability to complete his homework and other things he started but "chose" not to do so.  AR 331.

In October 2014, Claimant's sixth grade social studies teacher, Robert Gonzales, completed a teacher questionnaire.  AR 648-55.  Mr. Gonzales stated that Claimant was receiving instruction in reading, math and written language below the sixth grade level.  AR 648.  Claimant had obvious problems understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; expressing ideas in written form; and, learning new material.  AR 649.  Mr. Gonzalez noted that Claimant was receiving special education services for language arts.  AR 649.

---

[12] Because Claimant's teacher modified some check box answers previously completed by Plaintiff, the response is not always clear, particularly in the portions of the questionnaire concerning Claimant's ability to communicate (AR 325-26).  The Court has disregarded all items for which the response was unclear.

Claimant had serious problems paying attention when spoken to directly; focusing long enough to finish an activity or task; refocusing to task when necessary; carrying out multi-step instructions; completing work accurately without careless mistakes; and, working without distracting himself or others. AR 650. He had obvious problems organizing materials and changing from one activity to another without being disruptive. AR 650. Claimant had slight problems carrying out single-step instructions; completing class and homework assignments; and, working at a reasonable pace and finishing on time. AR 650. Claimant had no difficulty sustaining attention in play or sports activities, or waiting to take turns. AR 650.

Claimant had an obvious problem expressing anger appropriately and slight problems asking permission appropriately; following rules in the classroom, games or sports; respecting and obeying adults in authority; introducing and maintaining relevant and appropriate topics of conversation; taking turns in a conversation; and, using adequate vocabulary and grammar to express thoughts and ideas in every day conversation. AR 651. Claimant had no problems playing cooperatively with other children; making and keeping friends; seeking attention appropriately; relating experiences and telling stories; using language appropriate to the situation and listener; and, interpreting meaning of facial expression, body language, hints and sarcasm. AR 651.

Claimant had an obvious problem handling frustration appropriately. AR 653. He had slight problems being patient when necessary; identifying and appropriately asserting emotional needs; responding appropriately to changes in his own mood (calming himself); using appropriate coping skills to meet the daily demands of the school environment; and, knowing when to ask for help. AR 653. Gonzalez added that Claimant occasionally responded with information not related to the topic under discussion, probably because he did not fully understand what the topic was. AR 655.

In November 2014, Claimant's sixth grade science teacher Stephen Barrett reported that Claimant had no problems in any domain. AR 659-66.

In Spring 2015, Claimant scored below the CAASPP achievement standards for language arts/literacy and mathematics. AR 508.

### 6.  Seventh Grade (2015-16)

In fall 2015, Claimant began attending the seventh grade in middle school. AR 500-04. His prescription medications included Abilify and Concerta, neither of which was working well. AR 742.

In October 2015, Claimant was suspended for three days after planning a fight on Facebook, then fighting with another student. AR 491.  In November 2015, Claimant was suspended for two days for bringing prescription cold syrup from home, mixing it with Sprite, and distributing it to other students.  AR 490. In December 2015, Claimant was suspended for two days after he spoke out of turn; behaved rudely; said "all of the teachers are little bitches"; and told the classroom teacher "to shut the f--- up."  AR 489.

At some point in early 2016, Claimant became involved in the juvenile justice system. The record does not document the initial offense.  Following his first release from juvenile custody, Claimant repeatedly violated probation, abused drugs and ran away from home for varying lengths of time.  AR 729, 732.  His diagnoses included Bipolar I disorder, ADHD (combined type), oppositional defiant disorder and enuresis not due to a substance or known physiological condition.  AR 733.

### 7.  Seventh Grade Teacher Assessment

On April 27, 2016, Plaintiff's special education teacher Shirley Mathew completed a Social Security teacher questionnaire (SSA-5665-BK).  AR 435-42.  Ms. Mathew reported that Claimant, then in the seventh grade, had a second grade math level, third grade reading level and second to third grade written language level.  AR 435.  Claimant received both modified class work and a modified grading system.  AR 436.  He was frequently off task and had difficulty refocusing on his work if redirected.  AR 436.

Claimant had a serious problem in expressing ideas in written form; and obvious problems in reading and comprehending written material; comprehending and doing math problems; and, learning new material and applying problem solving skills in class discussions.  AR 436.  He had no problems in understanding and participating in class discussions and providing organized oral explanations and adequate descriptions.  AR 436.  .

Claimant had a very serious problem focusing long enough to complete an activity or task. AR 437. He had serious problems paying attention when spoken to directly; refocusing to task when necessary; completing class and homework assignments; completing work without careless mistakes; working without distracting himself or others; and, working at a reasonable pace and finishing on time. AR 437. Claimant had no problem sustaining attention during play or sports activities. AR 437.

Claimant had very serious problems expressing anger appropriately; asking permission appropriately; respecting and obeying adults in authority; using language appropriate to the situation and listener; and, interpreting the meaning of facial expressions, body language, hints and sarcasm. AR 438. He had a serious problem introducing and maintaining relevant and appropriate topics of conversation. AR 438. Claimant had obvious problems with seeking attention appropriately and following rules in the classroom, games and sports. AR 438. Claimant had no problem making and keeping friends; relating experiences and telling stories; or, taking turns in a conversation . AR 438. Ms. Mathew added:

> There are some problems with peers. Most other students tolerate him. There is constant issue with adults. [Claimant's] language and body language are highly disrespectful.

AR 438.

Claimant had very serious problems handling frustration appropriately; being patient when necessary; and, cooperating with and being responsible for taking his medication. AR 440. He had serious problems using good judgment regarding personal safety and dangerous circumstances; identifying and appropriately assessing emotional needs; responding appropriately to changes in his own mood (calming himself); and, using appropriate coping skills to meet the daily demands of the school environment. AR 440. Claimant had no problems in personal hygiene, caring for personal needs or knowing when to ask for help. AR 440.

### 8. 2016 Triennial Assessment

In April 2016, Mr. Koop and Ms. Mathew prepared a three-year evaluation to determine Claimant's continuing eligibility for special education and other appropriate services. AR 377-92. Claimant then attended seventh grade, where his grade point average was 2.25, first quarter;

1.25, second quarter; and, 2.06, third quarter. AR 378-79. At the beginning of seventh grade, Claimant had a second grade reading level (using the Common Core range). AR 380. His reading had not improved in the past 18 months. AR 380. Accommodations provided to the general education curriculum included one-to-one instruction and small group instruction. AR 380.

In the course of the 2016 assessment, Claimant displayed adequate attention and concentration except for a few momentary lapses. AR 382. Effort was adequate, even as the test items became more difficult. AR 382. He required frequent redirection. AR 382.

Results of the Woodcock-Johnson Tests of Cognitive Ability (4th Ed.) indicated that Claimant's general intellectual ability was low. AR 382-83. On the subtests of the Wechsler Individual Achievement Test (2d ed.), Claimant's scores ranged from very low to low average. AR 385. Ms. Matthews questioned the validity of the testing, however, noting that Claimant gave up easily and completed only a few items in each subtest. AR 385.

On the Conners Rating Scales, Claimant received very elevated scores in inattention, hyperactivity/impulsivity and learning problems/executive functioning. AR 388. Defiance/aggression was in the elevated range, and peer relations was in the average range. AR 388.

### 9. June 2016 IEP

Plaintiff's most recent IEP was completed May 10, 2016. AR 410-434. The IEP noted: "[Claimant's] ADHD makes it difficult for him to stay focused in the classroom setting." AR 410. Results of Claimant's SBAC assessment[13] scores indicated that he was functioning below the standards in all categories except reading, at which claimant was at or near the standard. AR 411. The report noted:

> Has friends, but has social conflicts with other students. Poor classroom behavior. Most frequently has issues with making inappropriate comments or at inappropriate times, disrupting the class. Uses racial slurs frequently, as well as severe profanity.

AR 412.

---

[13] The Smarter Balanced Assessment Consortium (SBAC) tests measure the student's knowledge and skills on the common core state standards. www.smarterbalanced.org/assessments (accessed January 13, 2020).

Plaintiff turned in little homework, if at all, and lacked materials for class. AR 412. School records included 40 behavioral entries including an unspecified number of suspensions, three on-campus suspensions and four positive comments. AR 412. Plaintiff experienced drowsiness from his medications. AR 412.

Accommodations included reduced or shortened assignments; seating near the teacher to facilitate prompt redirects; use of an assignment notebook planner; presentation of one direction at a time; repeated or rephrased instructions; teacher checks for understanding; and, extended time to complete assignments. AR 430. A behavioral intervention plan was included to address Claimant's use of misbehavior to avoid assignments. AR 432.

### 10. November 2016 IEP Meeting

When Claimant's IEP was evaluated in November 2016, he was attending eighth grade at the Alice Worsley School in the Fresno Juvenile Justice Center (JJC). AR 452-73. He was not passing his classes. AR 454. Despite the ability to do well in some classes, Claimant continued to demonstrate behavioral problems that frequently resulted in his being excluded from class. AR 454-55. Physicians at JJC discontinued Abilify and Methylphenidate, and prescribed Strattera.[14] Claimant continued to receive behavioral modification services. AR 461.

### 11. 2017 Teacher Assessment

On January 19, 2017, special education teacher R. Crowder competed a Social Security teacher questionnaire (SSA-5665-BK). AR 473-80. Crowder reported that Claimant was actually in the eighth grade but read and performed math below the sixth grade level. AR 473. Claimant had obvious problems comprehending and doing math problems; understanding and participating in class discussions, providing organized oral explanations and adequate descriptions; expressing ideas in written form; learning new material; and, applying problem-solving skills in class discussions. AR 474.

Claimant had serious problems carrying out multistep instructions; organizing his own things or school materials; and, completing class and homework assignments. AR 475. He had

---

[14] Strattera (Atomoxetine) is used as a part of a total treatment program to increase ability to pay attention and decrease impulsiveness and hyperactivity. www.medlineplus.gov/druginfo/meds/a603013.html (accessed January 14, 2020).

obvious problems focusing long enough to finish the assigned activity or task and working at a reasonable pace and finishing on time.  AR 475.

### B.  **The ALJ's Failure to Articulate the Required Legal and Factual Analysis**

Plaintiff contends that the ALJ's analysis of the educational records and opinions failed to clearly set forth her reasoning, including the weight given to various evidence and the basis of the conclusion that Claimant had marked limitations only in social functioning.  The Court agrees.  Taken as a whole, the hearing decision's analysis of the educational records and opinions does nothing more than summarize portions of the evidence within the record.  The decision makes no attempt to explain how and why the ALJ weighed the evidence and performed the whole child analysis as she did.  Further, the hearing decision minimized the evidence tending to illuminate the extent of Claimant's limitations while emphasizing the evidence ostensibly showing competence, suggesting that the decision may have been written to support a finding that Claimant's functioning was not impaired.

Notably, the ALJ characterized the testimony of Claimant and Plaintiff as less than fully reliable but did not perform a similar assessment of the reliability of other evidence or opinions.  For example, the ALJ apparently took at face value the report of sixth grade science teacher Stephen Barrett  that Claimant had no problems in any domain (AR 659-66) without questioning how a student with no problems in any domain received quarterly science grades of F, F, F and D- in Mr. Barrett's class (AR 485).  AR 22.  At the same time, the hearing decision did not address the detailed and more critical opinion prepared by Claimant's other sixth grade teacher, Mr. Gonzales.

The hearing decision also failed to provide meaningful analysis of lengthy, complex or disorganized evidence.  For example, with regard to the detailed behavioral opinions provided by Claimant's three fifth grade teachers, the hearing decision states only: "Teacher Questionnaires dated December of 2013 rated the claimant's behavior from a little problem to very much a problem on Conner[s] scale." AR 21.  As discussed in the summary of Dr. Domanska's opinions,

however, careful attention to the teachers' responses indicated that the teachers generally agreed that Claimant had serious problems with attention span, distractibility, excitability, impulsiveness, restlessness, inability to sit still, self-control, impatience, immaturity and excessive need for teacher attention.  AR 444, 445, 447.

Although an ALJ is required to consider a claimant's functional limitations in the context of age-appropriate functioning demonstrated by same-aged children without the claimant's impairments, the hearing decision in this case does not indicate that the ALJ performed this analysis.  *See* S.S.R. 09-1p, 2009 WL 396031 at *2.  This omission is significant in light of Claimant's IEPs, which, among other considerations, provided supplemental individual and small group instruction, reduced the amount of homework assigned to Claimant, extended the time periods in which he was required to complete his homework, and adjusted the grading system to be more lenient in evaluating Claimant's performance.  Claimant also received special services as a "language learner" until the age of fifteen.

Although test results and teacher evaluations indicated significant underachievement in comparison with peers, the ALJ's analysis did not compare Claimant's ability to grade-level peers.  For example, the ALJ did not explicitly analyze such factors as Claimant's language and math performance levels, which were consistently noted as far below grade level; failure to perform at grade level on standardized tests despite multiple testing accommodations; and subjective reports from teachers and other school person concerning such factors as immaturity, poor functional classroom skills, and inability to observe common safety rules.  In short, the ALJ's analysis, as set forth in the hearing decision, neither satisfied the regulatory requirements nor conformed to the analysis set forth in S.S.R. 09-1p.

At least in part, the analysis reflects Plaintiff's contention that the ALJ selectively employed facts in the record to support her conclusions.  "An ALJ may not rely on some portions of a report, while disregarding others."  *Reddick*, 157 F.3d at 720.  It is error to isolate a specific quantum of positive mental health evaluations when the record as a whole includes numerous other evaluations indicating worsening symptoms or marked or severe limitations.  *Orn*, 495 F.3d at 630;  *Delegans v. Colvin*, 584 Fed. Appx. 328, 330-31 (9th Cir. 2014).  "An ALJ may not single

28

out moments of good health to discredit a claimant, especially in cases involving mental impairments, which often present episodically." *Delegans*, 584 Fed.Appx. at 331 (citing *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011); *Holohan*, 246 F.3d at 1205.

An example of such random fact finding is the ALJ's summary of the April 2014 IEP, which includes various facts and opinions drawn out of context but fails to note that Claimant was classified as an English learner and provided with accommodations in listening, speaking, reading and writing (AR 592); accommodations in the CAASP administration including computerized visual modification, scratch paper, a separate test administration setting, math tools, spellchecker, a calculator, multiplication table and read-aloud service for math subtests (AR 593-99); accommodations such as simplified instructions and alternative testing in a small group on CMA and CELDT tests (AR 600-04); and various classroom accommodations including reduced/shortened assignments, preferential seating, cues/prompts/reminders of rules, simplified and repeated instructions and extended time to complete assignments (AR 607).

In short, the ALJ's conclusions drawn from Claimant's educational records are not supported by substantial evidence.

## IX.   Evaluating Children's Disabilities

Plaintiff contends that if the ALJ had first properly analyzed the educational and medical evidence and opinions, and then properly conducted the whole child analysis, the ALJ would have had to determine that Claimant had marked limitations in the domains of caring for self and attending and completing tasks. The Commissioner maintains that substantial evidence supported the ALJ's determinations. Having concluded that the ALJ failed to consider the record as a whole, the Court agrees with Plaintiff that the ALJ's whole child analysis was not reliable and thus reversal is necessary.

### A.   Evaluating a Child's Disability, In General

"An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(I).  The Commissioner employs a three-step sequential evaluation process to determine whether a child is disabled.  *See* 20 C.F.R. § 416.924.  The sequential evaluation proceeds as follows:

> **Step 1.**  The ALJ determines whether the claimant is engaged in substantial gainful activity; if so, the claimant is presumed not disabled and the claim is denied;

> **Step 2.**  If the claimant is not engaged in substantial gainful activity, the ALJ determines whether the claimant has a severe impairment; if not, the claimant is presumed not disabled and the claim is denied:

> **Step 3.**  If the claimant has one or more severe impairments, the ALJ determines whether any such severe impairment meets, medically equals, or functionally equals an impairment listed in the regulations; if the claimant has such an impairment, the claimant is presumed disabled and the claim is granted.

> *See* 20 C.F.R. § 416.924 (a)-(d).

Under the regulations, an impairment will be found to be functionally equivalent to a listed impairment if it results in extreme limitations in one area of functioning ("domain") or marked limitations in two areas.  20 C.F.R. 926a(a).  The six domains include acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for yourself, and health and physical well-being.  20 C.F.R. 926a(b).  The functional limitations must result from the claimant's medically determinable impairments.  20 C.F.R. § 416.924a(a).  Unlike disability applications for adults, evaluating a child's disability claim does not include determination of the claimant's residual functional capacity or consideration of vocational issues.

Unless the Commissioner can make a determination or decision based on the listed impairments that is fully favorable to a child claimant, the Commissioner must evaluate the "whole child" to determine whether the child's impairments are functionally equivalent to a listed impairment.  S.S.R. 09-1p, 2009 WL 396031 at *1-2 (Feb. 17, 2009).  "The functional equivalence rules require [the adjudicator] to begin by considering how the child functions every day and in all settings compared to other children the same age who do not have impairments."  *Id.* at *2.  The adjudicator can only assign the child's abilities and limitations to one or more particular domains after those abilities and limitations have been identified.  *Id.*  In the final step,

the adjudicator must determine whether one or more of the child's medically determinable impairments accounts for the child's identified limitations and rate the overall severity of that limitation in each identified domain. *Id.* The technique requires consideration of the following questions:

> How does the child function? "Functioning" refers to a child's activities; that is, everything a child does throughout the day at home, at school, and in the community, such as getting dressed for school, cooperating with caregivers, playing with friends, and doing class assignments. We consider:
>
> - What activities the child is able to perform,
>
> - What activities the child is not able to perform,
>
> - Which of the child's activities are limited or restricted,
>
> - Where the child has difficulty with activities—at home, at school, or in the community,
>
> - Whether the child has difficulty independently initiating, sustaining or completing activities,
>
> - The kind of help, and how much help the child needs to do activities, and how often the child needs it, and
>
> - Whether the child needs a structured or supportive setting, what type of structure or support the child needs, and how often the child needs it.
>
> *Id.* at *2-3 (citing 20 C.F.R. 416.926a(b)(2)).

After the adjudicator has answered these initial questions, he or she must assign each activity to all the domains it affects, determine whether the child's medically determinable impairments account for the child's limitations and determine the degree to which the impairments limit the child's ability to operate in each domain in an age-appropriate way. *Id.* at *3. Appropriate use of the technique should reflect the functional manifestations of the child's impairments both individually and in combination. *Id.*

## C. **Attending and Completing Tasks**

In the domain of attending and completing tasks, the Commissioner considers how well the minor claimant is able (1) to focus and maintain attention; (2) to filter out distractions and remain focused with consistent attention of the activity or task at hand; (3) the pace at which the

minor claimant can perform activities; and, (4) the ease with which the minor claimant can change activities or tasks. 20 C.F.R. § 416.926a(h). Limited functioning in this domain may be indicated by such limitations as failure to focus, easy distraction, easy frustration and giving up on tasks, including those you are capable of completing, and requiring extra supervision to keep you engaged in an activity. 20 C.F.R. § 416.926a(h)(3).

Adolescent behavior is to be considered with anticipation of entering the workplace. C.F.R. § 416.926a(h)(2)(v). Adolescents should be able to pay attention for increasingly longer presentations and discussions, maintain concentration while reading textbooks and independently plan and complete long-range academic projects. 20 C.F.R. § 416.926a(h)(2)(v). An adolescent claimant is expected to be able to organize materials and plan use of time to complete school tasks and assignments. *Id.*

Review of the evidence suggests that Claimant cannot meet these standards. The accommodations provided in the 2016 IEP included multiple strategies to assist Claimant in attending and completing tasks, including multiple provisions for teacher redirection and monitoring, simplified, repeated and restated directions; and aids to organization such as a notebook planner. Similar accommodations were provided for standardized testing. On a few occasions, such as one-to-one testing with Mr. Koop, Claimant was able to sustain attention sufficiently to complete sufficient testing to render a reliable result. In other situations, such as Ms. Mathews' achievement testing, Claimant completed too little of the test for the results to be valid. The Commissioner must fully analyze this domain and all related impairments on remand.

### D. **Caring for Yourself**

In the domain of caring for yourself, the Commissioner evaluates how well the claimant maintains a healthy emotional and physical state, including how well the claimant meets his physical and emotional in appropriate ways; how well he copes with changes in his environment; and, whether the claimant can care for his own health, possessions and living area. 20 C.F.R. § 416.926a(k). "Caring for yourself effectively, which involves regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs and safety." 20

32

C.F.R. § 416.926a(k)(1)(i).  Among other factors, "you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions." 20 C.F.R. § 416.926a(k)(1)(iii).  "Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from, others."  20 C.F.R. § 416.926a(k)(1)(iii).  Limited functioning in this domain may include developmentally inappropriate soothing behavior (e.g., thumb sucking or rocking), developmentally inappropriate hygiene habits, self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury or refusal to take medication), disregard of safety rules, or disturbances in sleep or eating habits. C.F.R. § 416.926a(k)(3).

School-age children (ages 6 to 12) are expected to be independent in day-to-day personal care such as dressing, bathing and similar activities.  20 C.F.R. § 416.926a(k)(2)(iv).  "You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior.  You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you.  You should begin to imitate more of the behavior of adults you know."  20 C.F.R. § 416.926a(k)(2)(iv).  Although appropriately identified as an adolescent, the record indicates that Claimant could not meet these expectations of younger children.

Adolescents such as Claimant are expected to experience developmental changes to their bodies and emotions, and some anxiety and frustration associated with those changes.  20 C.F.R. § 416.926a(k)(2)(v).  Adolescents should begin to discover appropriate ways of expressing both good and bad feelings and to be able to calm themselves as necessary.  20 C.F.R. § 416.926a(k)(2)(v).  They begin thinking seriously about future plans, including what they will do when they have completed school.  20 C.F.R. § 416.926a(k)(2)(v).  The record does not support a finding that Claimant had the requisite ability to identify and express his feelings, or the ability to exercise self-control to achieve appropriate behavior.

///

33

The evidence of record suggests the need to analyze the evidence of record to evaluate the extent of Claimant's limitations in caring for himself. Notably, Claimant, who was fourteen years old on the date of the administrative hearing, was indifferent to his personal safety and unable to manage his own medication and psychological treatment. Neither Plaintiff nor the ankle monitor required as a condition of his probation could keep Claimant from running from home, living on the streets or abusing drugs and alcohol. In sixth grade, his teacher noted Claimant's inability to observe safety rules, such as looking both ways before crossing the street. In seventh grade, Claimant brought prescription medication to school and distributed it to classmates.

### E. Analyzing the Effects of an Impairment on the Six Domains

The Commissioner has provided a sample analysis concerning a hypothetical claimant with ADHD who has troubles reading, following classroom instructions, playing with others and avoiding danger. SSR 09-1p at *4-5. The Ruling states: "Even though attentional difficulties and hyperactivity are hallmarks of AD/HD, in this case, it would be incorrect to assume that this child's AD/HD causes limitations only in the domain of 'Attending and completing tasks.'" *Id.* at *5. Setting forth a detailed explanation of the appropriate analysis, the sample found that the hypothetical claimant's ADHD resulted in limitations in four possible domains: attending and completing tasks, acquiring and using information, interacting and relating with others and caring for yourself. *Id.* at *4-5.

Although Claimant in our case manifests limitations in social interaction in the context of his relationships with adults but not peers, the sample provides a useful analogy. However, the ALJ did not examine Claimant's limitations with similar detail and thought.

The Ruling also reviews the limitations of a slow learner recently diagnosed with depression. SSR 09-1p at *6. The hypothetical claimant's mental health diagnosis resulted in additional symptoms including inattentiveness, lack of motivation, failure to complete assignments, mood changes, irregular sleeping and eating, irritability, uncooperativeness and anger. *Id.* As a result, this hypothetical claimant had limitations in four possible domains: attending and completing tasks, acquiring and using information, interacting and relating with others and caring for yourself. *Id.*

34

The second hypothetical reminds us that Claimant has three diagnosed impairments: ADHD, bipolar disorder and oppositional defiant disorder.  Accordingly, to the extent that the ALJ minimized the effects of Claimant's ADHD based on comments in the educational records that he could accomplish certain tasks if he only demonstrated more effort, the ALJ erred in disregarding Claimant's diagnoses of bipolar disorder and oppositional defiant disorder.

Whether Claimant's limitations are marked or extreme requires analysis of all of Claimant's activities in all domains.  *Id.* at *9.  The adjudicator must consider the number of activities affected in each domain , the importance of the limited activities to age-appropriate functioning, the frequency with which the activities occur, how frequently the activities are limited, and what support or assistance the child requires with regard to the limited activities.  *Id.* The Ruling cautioned:

> [T]he rating of the domain is not an "average" of what activities the child can and cannot do.  When evaluating whether a child's functioning is age appropriate, adjudicators must consider evidence of all of the child's activities.  We do not "average" all of the findings in the evidence about a child's activities to come up with a rating for the domain as a whole.  The fact that a child can do a particular activity or set of activities relatively well does not negate the difficulties the child has in doing other activities.

SSR 09-1p at * 10.

Finally, the Ruling includes a sample Functional Equivalence Analysis.  *Id.* at *10-12. When contrasted with the analysis set forth in the hearing decision in this case, understanding the shortcomings of the hearing decision becomes easier.  Unlike the ALJ's focus on the documentary and opinion evidence and the credibility of the expert opinions, the sample analysis categorizes each of the hypothetical claimant's behavioral limitations under all domains to which it relates, using specific examples of what the child does and how the child does it (e.g., "does little work in class or in school and has fallen behind") rather than a conclusory statement such as "the child is anxious."  *Id.* at *11.  Only then does the adjudicator determine whether the limitations are attributable to one or more of Claimant's medically determinable impairments and assess whether the limitations result in marked or severe limitation in any of the domains.  In contrast, the hearing decision in this case focuses largely on  the relative credibility of various

sources of information and performs the whole child analysis with very limited consideration of specific behavioral limitations and the domains to which each may relate. This inadequate analysis constituted error.

### X. Remand Is Required for Further Proceedings

When the Commissioner's decision is not supported by substantial evidence, the Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). "Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004). Here, remand is appropriate to allow the Commissioner to consider the evidence as a whole and to fully evaluate it using the required whole child analysis

### XI. Conclusion and Order

Based on the foregoing, the Court finds that the Commissioner's determination that Plaintiff is not disabled is not supported by substantial evidence in the record as a whole and is not based on proper legal standards. Accordingly, this Court reverses the administrative decision of the Commissioner of Social Security denying Claimant disability benefits and remands the case for further proceedings consistent with this opinion. The Clerk of Court is directed to enter judgment in favor of Plaintiff Sophia Quintanar on behalf of Claimant J.Q. and against Defendant Andrew Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated: __February 24, 2020__        _____**/s/ Gary S. Austin**_____
                                                 UNITED STATES MAGISTRATE JUDGE